**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MAJED KHAWATMI, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | No. 3:08cv1632 (MRK) |
| | : | |
| DEPARTMENT OF HOMELAND | : | |
| SECURITY, U.S. CITIZENSHIP AND | : | |
| IMMIGRATION SERVICES, ERIC | : | |
| HOLDER, FRANCES HOLMES, | : | |
| ETHAN ENZER,[1] | : | |
| | : | |
| Respondents. | : | |

## MEMORANDUM OF DECISION

Petitioner Majed Khawatmi is a lawful permanent resident of the United States who has twice applied to be naturalized as a United States citizen. On June 29, 2007, the United States Citizenship and Immigration Services ("USCIS") denied Mr. Khawatmi's second naturalization application. Mr. Khawatmi filed an administrative appeal from that denial, and after a hearing, USCIS affirmed the denial of his application on September 16, 2008. On October 24, 2008, Mr. Khawatmi petitioned this Court for a *de novo* review of his application pursuant to 8 U.S.C. § 1421(c). *See* Compl. [doc. # 1].

There are two separate legal issues in this case. The first issue is whether Mr. Khawatmi is a person who "has been lawfully admitted to the United States for permanent residence."

---

[1] When Mr. Khawatmi filed this case, he named then-Attorney General Michael Mukasey as a Respondent. Since this case was filed, Eric Holder succeeded Michael Mukasey as Attorney General. **The Clerk of the Court is directed to terminate Michael Mukasey as a Respondent and to add Eric Holder as a Respondent.**

8 U.S.C. § 1429. USCIS found, and the Government argues here, that Mr. Khawatmi is *per se* ineligible for naturalization because he entered into a "sham" marriage with his ex-wife, Virginia Vega,[2] in order to gain his immigration status, and thus was never lawfully admitted for permanent residence. *See Linares Huarcaya v. Mukasey*, 550 F.3d 224, 228 (2d Cir. 2008) ("To be admissible to the United States on the basis of marriage to a United States citizen, an applicant must establish that the qualifying marriage was not entered into for the purpose of procuring an alien's admission as an immigrant." (quotation marks and citation omitted)). The second issue is whether Mr. Khawatmi "has been and still is a person of good moral character." 8 U.S.C. § 1427(a)(3). USCIS also found, and the Government also argues here, that Mr. Khawatmi is not a person of good moral character, and is thus currently ineligible for naturalization, because he did not truthfully answer questions about his marriage to Ms. Vega in connection with his naturalization application.

After receiving proposed findings of fact and conclusions of law from both parties, the Court held a one-day hearing in this case on July 28, 2010. *See* 8 U.S.C. § 1421(c) ("[T]he district court . . . shall, at the request of the petitioner, conduct a hearing *de novo* on the application."). The key matters in contention at the hearing were Mr. Khawatmi's credibility and the credibility of Ms. Vega. The parties also submitted post-hearing briefs. This opinion contains the Court's findings of fact and conclusions of law, as required under § 1421(c).

At the outset, the Court notes that it certainly has concerns regarding the nature of Mr. Khawatmi's marriage to Ms. Vega. Specifically, many elements of their story relating to the later years of their marriage simply do not add up. However, in the Court's view, the evidence in the

---

[2] In order to avoid confusion, the Court refers to Ms. Khawatmi's ex-wife throughout this opinion as Virginia Vega, despite the fact that she is now known as Virginia Bowen.

record does not support the Government's conclusion that the pair's marriage was a sham at the outset. That said, the Court agrees with the Government that Mr. Khawatmi gave false testimony about his marriage in connection with his naturalization application. The Court therefore must conclude that Mr. Khawatmi has failed to carry his burden of establishing by a preponderance of the evidence that he "has been and still is a person of good moral character." 8 U.S.C. § 1427(a)(3). Mr. Khawatmi's petition for naturalization, s*ee* Compl. [doc. # 1], is thus DENIED.

## I.

Mr. Khawatmi seeks *de novo* review of his naturalization application pursuant to 8 U.S.C. § 1421(c). The Second Circuit recently summarized the history of § 1421(c) in *Bustamante v. Napolitano*, 582 F.3d 403 (2d Cir. 2009). Because this is the Court's first experience reviewing an application under § 1421(c), the Court repeats that history here:

> Before the Immigration Act of 1990, the INS (now USCIS) would investigate a naturalization applicant and provide the district court with a recommendation that the court was free to accept or reject in ruling on the application. Because Congress sought to expedite the processing of naturalization applications that were subject to an extensive backlog, the Act provided USCIS with authority to decide naturalization applications in the first instance. The Act ensures that naturalization applications granted by USCIS never come before the district court. Yet the act secures an applicant's right to obtain judicial review by giving district courts jurisdiction over naturalization applications, upon the request of an applicant, when USCIS denies an application, or fails to decide an application in a timely fashion. When USCIS denies an application, [§] 1421 provides that the district court's review of the denial is *de novo*, and the court is required to make its own findings of fact and conclusions of law.

*Id*. Before seeking review pursuant to § 1421(c), an applicant whose application was denied must first request a hearing before an immigration officer. *See* 8 U.S.C. § 1447(a) (permitting an applicant to request such a hearing); *id.* § 1421(c) (permitting an applicant to seek review in the district court only "after a hearing before an immigration officer under 1447(a)"); *Escaler v. USCIS*, 582 F.3d 288, 292 (2d Cir. 2009) ("Section 1421(c) . . . requires the exhaustion of

administrative remedies prior to seeking . . . relief."). There is no dispute in this case that Mr. Khawatmi sought, and obtained, such a hearing.

## II.

Pursuant to § 1421(c), the Court makes the following findings of fact. The Court's findings of fact are based on the parties' stipulations as to uncontroverted facts, the exhibits submitted in advance of the hearing, and the testimony of the witnesses at the hearing. As an initial matter, the Court notes there are some discrepancies in the record regarding Mr. Khawatmi's country of origin. In his initial filing, Mr. Khawatmi described himself as "a native and citizen of Egypt." Compl. [doc. # 1] ¶ 4. The Government contended in response that Mr. Khawatmi is, in fact, a native and citizen of Syria. *See* Answer [doc. # 8] ¶ 4. The parties later stipulated that Mr. Khawatmi is from Egypt. *See* Jt. Trial Mem. [doc. # 29] at 4. But Mr. Khawatmi's Proposed Findings of Fact [doc. # 32] contain references to his sending money to his mother in Syria – not Egypt. *See id.* ¶ 10. And at the hearing, Mr. Khawatmi testified under oath that his country of birth is Syria. *See* Tr. [doc. # 54] at 11:9-10. Indeed, the transcript of the hearing contains numerous references to Syria, *see id.* at 11:9, 60:12, 143:7, 207:20, and no references to Egypt whatsoever. The Court can only assume that the references to Egypt in this case resulted from mistakes and oversights by counsel.

## A.

Mr. Khawatmi entered the United States from Canada without inspection on or about July 18, 1996. In late 1996, when Mr. Khawatmi was twenty-eight years old and Ms. Vega had just turned twenty-one years old, the pair met at a convenience store in Bridgeport, Connecticut. Mr. Khawatmi frequented the store in part because his friend Nidal Dimmad worked there. Ms. Vega lived near the store with her mother and a nephew. Mr. Dimmad was from Syria, and Mr.

Khawatmi had struck up a friendship with Mr. Dimmad on the basis of their shared background. Long before Mr. Dimmad and Mr. Khawatmi met, Mr. Dimmad's father divorced his foreign-born wife and married a United States citizen, who then petitioned for Mr. Dimmad's father to become a United States citizen. Although Mr. Khawatmi and Ms. Vega met at Mr. Dimmad's workplace, Mr. Dimmad never saw them express any affection for one another.

Mr. Khawatmi and Ms. Vega started dating soon after their meeting. They tell slightly different stories about their dating experiences. According to Mr. Khawatmi, they mostly spent their time together taking walks and visiting a park in Bridgeport. On one occasion, however, they went to the movies. *See id.* at 14:18-22 ("A lot of time, we just go out for a walk. . . . And we went out couple times to a diner in Bridgeport. One time we went to the movies. But it was mostly like kind of walk, think."). According to Ms. Vega, however, they went to a considerable number of movies together. *See id.* at 186:9-20 ("We went out to the movies. . . . A bunch of times. I don't keep track. . . . We went several times."). Ms. Vega even recalls with some specificity which movies they saw, and where they saw them. *See* Resp.'s Ex. 516 ("When we'd go to the movies, we always went to the theatre just off the Black Rock Turnpike near the Bridgeport-Fairfield town line. Majed always took me to see the latest Denzel Washington movies . . . I'm a big fan of Denzel.").[3]

Regardless of whether they spent their early months together taking in the latest Denzel

---

[3] According to the Denzel Washington filmography page on the Internet Movie Database, http://www.imdb.com/name/nm0000243/ (last visited Feb. 9, 2011), only one Denzel Washington movie opened in theaters during the period in which Mr. Khawatmi and Ms. Vega allegedly started dating: *The Preacher's Wife* (Touchstone Pictures 1996), a romantic comedy in which Mr. Washington played a preacher married to a choir director played by the singer Whitney Houston, opened on December 13, 1996. Mr. Washington's previous film, *Courage Under Fire* (Fox 2000 Pictures 1996), opened on July 12, 1996, two days before Mr. Khawatmi arrived in the United States. Mr. Washington did not appear in any feature films in 1997.

Washington movies, or whether they got to know each other mostly during contemplative walks, in early 1997 – only a few months after Mr. Khawatmi met Ms. Vega and only about six months after Mr. Khawatmi entered the United States – Mr. Khawatmi asked Ms. Vega to marry him. Ms. Vega did not accept immediately. Instead, she told Mr. Khawatmi that she needed time to think about the proposal.

Ms. Vega eventually accepted Mr. Khawatmi's proposal, and they were married before a Justice of the Peace in Bridgeport on August 20, 1997, only about twelve months after they met. Mr. Khawatmi's and Ms. Vega's wedding was, in the Court's view, somewhat unusual. Although Ms. Vega lived with her mother and was close with her, her mother did not attend the wedding ceremony, as she was in Puerto Rico at the time. At the hearing, Ms. Vega had no clear answer as to why they did not wait to get married until after Ms. Vega's mother returned from Puerto Rico. *See id.* at 155:2-5 ("She had an emergency in Puerto Rico that my grandmother got sick, something, something like that. *I can't remember*, but she had a trip to Puerto Rico and she couldn't change the date." (emphasis added)). Ms. Vega claimed that "a couple" of their friends attended the wedding, but that she is no longer in touch with any of them, does not know where any of them now live, and does not know how to get in touch with any of them. *Id.* at 155:11-19. Ms. Vega also claimed that the couple once had photographs of their wedding, but that they are now lost. Indeed, neither Mr. Khawatmi nor Ms. Vega has *any* photographs of the two of them together. Though they claim that they lost all of their photographs after getting divorced, the Court is somewhat skeptical about that claim. Finally, the couple's wedding certificate listed 2505 North Avenue in Bridgeport as their residential address. *See* Pet.'s Ex. 4. But at trial, Mr. Khawatmi admitted that 2505 North Avenue in Bridgeport was in fact "the address . . . [of] a gas station owned by somebody I know," and that he listed that address because he wasn't "really

sure where" the couple was going to be living. *Id.* at 102:10-12.

After their wedding – which took place on a Wednesday – the newlywed couple spent a honeymoon weekend at the Fairfield Inn at the Circle in Fairfield. Mr. Khawatmi and Ms. Vega then moved into Ms. Vega's mother's house at 79 Hancock Avenue in Bridgeport, where they lived in Ms. Vega's bedroom. On September 24, 1997, a mere thirty-five days after their wedding, Ms. Vega sponsored Mr. Khawatmi for a green card. *See* Pet.'s Ex. 1; Resp.'s Exs. 501-10. Mr. Khawatmi hired an attorney to process his green card application. In May 1998, approximately five months after they moved into Ms. Vega's mother's house, Mr. Khawatmi and Ms. Vega moved to 74 Whittier Street in Bridgeport. *See* Pet.'s Ex. 5. Eventually, on February 1, 1999, Mr. Khawatmi received his green card. He became a lawful permanent resident of the United States on February 25, 2002.

At the hearing, the parties introduced numerous exhibits and the witnesses testified in detail about the couple's work and finances. Mr. Khawatmi testified that during their marriage, he worked at a dry cleaning business called Great American Dry Cleaners in Monroe, a town approximately fifteen miles due north from Bridgeport.[4] *See* Tr. [doc. # 54] at 20:6-9. But when asked about Mr. Khawatmi's job at the trial, Ms. Vega stated that he worked at a dry cleaning business "off of Main Street" in Bridgeport, and that although she recalled visiting Mr. Khawatmi at his workplace, she could not recall the name of the dry cleaning business. *Id.* at 157:18-158-3. During the same period, Ms. Vega worked first as a nurse's aide at a nursing home in Southport, which is about five miles southwest from Bridgeport. She later worked at a hospital in Shelton, which is about fifteen miles northeast from Bridgeport and about seven miles due east

---

[4] The approximate distances discussed here come from searches performed using Google Maps, http://maps.google.com/ (last visited Feb. 9, 2011).

from Monroe, where Mr. Khawatmi apparently worked at the same time.

Mr. Khawatmi testified at the hearing that for most of the time the couple lived together at 74 Whittier Street in Bridgeport, he paid the rent. *See* Tr. [doc. # 54] at 23:10-11. He testified that he and his wife had a joint bank account at People's Bank during that time. *See id.* at 25:4-8. It is impossible to tell from the bank statements whether they both actually made deposits to and drew funds from the joint bank account. *See* Pet.'s Exs. 11-15, 42-44, 61-62. However, Mr. Khawatmi admitted at the hearing that Ms. Vega generally did not deposit her paychecks into their joint bank account. *See* Tr. [doc. # 54] at 109:23-110:2. Ms. Vega testified that she generally cashed her checks and used the money to purchase groceries and pay utility bills, rather than depositing them into the joint bank account. *See id.* at 162:13-24. Some of the utility bills from that period were addressed to Majed Khawatmi "c/o Virginia Vega." Pet.'s Exs. 7, 21-31. Others were addressed to them both. *See* Pet.'s Exs. 32- 40. They each initially filed a separate tax return for 1997, but they eventually filed an amended, joint return at the request of Mr. Khawatmi's immigration attorney. *See* Pet.'s Ex. 17. However, Mr. Khawatmi filed his taxes for 2000, 2001, 2002, and 2003 separately from Ms. Vega. *See* Pet.'s Exs. 63-68, 70-71.

Both Mr. Khawatmi and Ms. Vega insist that they lived together at 74 Whittier Street in Bridgeport during most of their marriage. But oddly, during the very period when they claim to have lived together, Ms. Vega received some very important mail from her employer – specifically, her W-2 forms for 1999, 2000, and 2001 – at a different address: 91 Fourth Street in Ansonia. Ansonia is only about three miles north from the hospital where Ms. Vega worked in Shelton. Ms. Vega testified at the hearing that 91 Fourth Street in Ansonia was her brother's address. *See* Tr. [doc. # 54] at 159:5. According to Ms. Vega, her brother had only recently been released from prison when she started having her W-2 forms sent to his address. *See id.* at 159:8.

Ms. Vega offered two different explanations about why she decided to send her W-2 forms to that address. First, she suggested that the mail was sometimes stolen from her Bridgeport apartment. *See id.* at 159:8-11("[M]y brother just came out of prison and he asked me if I could help him get an apartment, and because where we used to live on Whittier Street, environment wasn't – they used to steal mail."). When asked why some of her other mail was nevertheless sent to the Whittier Street address, she responded that "immigration . . . told us that I needed to put the address where I was staying at." *Id.* at 159:17-18. Second, she suggested that having her W-2 forms sent to his apartment would somehow help her brother be approved as a renter despite his poor credit. *See id.* at 212:16-23 ("[H]e didn't have no credit and, you know, I needed, at that time, I had told him to put, you know, to put my income tax, my W-2 form to go to the house to help him so he could get his own place, take it off my name and put it under his name."). When pressed, however, Ms. Vega could not explain why she believed that sending her own W-2 forms to Ansonia would have any impact on her brother's ability to rent his own apartment.

According to Mr. Khawatmi, his relationship with Ms. Vega started strong, but began to decline sometime in 2000. Ms. Vega did not like the fact that Mr. Khawatmi sent money to his mother in Syria. They were both working long hours and seeing each other less. Also, beginning in 1999, Ms. Vega started to hang out with her friends, whom Mr. Khawatmi did not like. Ms. Vega admitted that she felt lonely as Mr. Khawatmi was not giving her the attention she wanted, and that she and her friends regularly went to clubs and drank. In May 2000, Ms. Vega was arrested on drug charges, although she apparently never told Mr. Khawatmi of her arrest or of her visits to probation. Eventually, Ms. Vega moved in with her mother in July 2000. She was gone for about one or two months, but eventually moved back into the Whittier Street apartment.

About three weeks to a month after Ms. Vega moved back in with Mr. Khawatmi, Mr.

Khawatmi discovered that Ms. Vega was pregnant. He also discovered that he was not the father of Ms. Vega's child. According to Ms. Vega, she became pregnant during a "one-night stand" with a man named Eric Bowen following a night out with her girlfriends. *See id.* at 170:23-171:1 ("I went to the club, I was drinking, I was, you know, being high and it just happened, you know? I went out and I was having fun with the girls, I just had a one-night stand . . . ."). Although Mr. Khawatmi was "furious" at Ms. Vega, *id.* at 170:16, Mr. Khawatmi and Ms. Vega allegedly stayed together following the birth of her child on April 19, 2001.

At the hospital on April 19, 2001, Ms. Vega decided to name her child Eric Sean Bowen, Jr. *See* Resp.'s Ex. 524. Mr. Bowen was present for the birth. Given that Ms. Vega claims she intended to remain married to Mr. Khawatmi, the Court finds it rather unusual that she choose to name her child after the biological father. The Court finds that fact still more surprising because Ms. Vega claims the full extent of her relationship with Mr. Bowen was that she slept with him once following a visit to a nightclub with her girlfriends. Furthermore, that is not even only suspicious aspect of the birth. In the hospital records, Ms. Vega listed as her residential address as 159 Charles Street in Bridgeport – her mother's address at the time – rather than the Whittier Street address where she supposedly still lived with Mr. Khawatmi. *See* Resp.'s Ex. 524.

Mr. Khawatmi admits that things went "downhill" in their marriage after the birth of Ms. Vega's son, as Mr. Khawatmi understanding felt he could no longer trust Ms. Vega. Tr. [doc. # 54] at 51:23-24. But Mr. Khawatmi also claims that he continued to support the child financially and also tried to help raise the child. According to Mr. Khawatmi's deposition testimony, he even considered the child as "part of his family." *See id.* at 124:19-25.

After the birth of Ms. Vega's child, Ms. Vega's mother took care of the baby while Ms. Vega returned to work. Mr. Bowen sometimes visited the baby at Ms. Vega's mother's house. In

2002, Mr. Khawatmi, Ms. Vega, and the child moved to Madison Avenue in Bridgeport. *See* Pet.'s Exs. 55-56. Near the end of 2003, after contracting asthma from years of working at a dry cleaning business, Mr. Khawatmi decided to start his own candy distribution business. However, the business did not flourish. Thereafter, Mr. Khawatmi decided to go to school to become a heating and cooling technician. Mr. Khawatmi still works as a heating and cooling technician.

In June 2003, Ms. Vega moved out of the house where she lived with Mr. Khawatmi, because they were not getting along. She initially moved in with her mother, and later moved in with a friend. Mr. Khawatmi and Ms. Vega were divorced in January 2004. On the divorce papers, they did not list any children. *See* Resp.'s Ex. 525. In January 2005, Ms. Vega had a second child with Mr. Bowen, and two married in April 2005. Ms. Vega took Mr. Bowen's name, and the two moved to Georgia. Mr. Khawatmi has continued to help Ms. Vega financially since their divorce. Mr. Khawatmi himself remarried in 2008.

**B.**

As mentioned above, Mr. Khawatmi became a lawful permanent resident of the United States on February 25, 2002.[5] Ten days later, on March 7, 2002, Mr. Khawatmi filed his first naturalization application. *See* Resp.'s Ex. 530. At the time, he was not represented by counsel. Mr. Khawatmi claimed on his application that he was eligible for naturalization because he had been a lawful permanent resident for at least three years, because had been married to and living with the same United States citizen for the last three years, and because his spouse had been a United States citizen for the last three years. *See* 8 U.S.C. § 1430(a). Mr. Khawatmi was

---

[5] Although the Court's review is *de novo*, the Court sets forth the procedural background of this case in some detail because one of the Government's central arguments here is that Mr. Khawatimi is ineligible for naturalization because he made untruthful statements to federal agents in the course of the application process.

interviewed by USCIS Officer Christopher Fonda on December 18, 2002. USCIS denied Mr. Khawatmi's first naturalization application on March 4, 2003. *See* Resp.'s Ex. 522. Significantly, in connection with his first naturalization application, Mr. Khawatmi submitted a copy of Ms. Vega's driver's license that listed an address different from Mr. Khawatmi's address, and also submitted copies of his wife's W-2 forms listing an address different from Mr. Khawatmi's address. *See id.* Mr. Khawatmi never exhausted administrative remedies regarding the denial of his first naturalization application.

Mr. Khawatmi filed his second naturalization application on October 14, 2004. *See* Resp.'s Ex. 529. Only that second naturalization application is at issue in this proceeding. Mr. Khawatmi was not represented by counsel when he filed the second naturalization application. Mr. Khawatmi claimed on his application that he was eligible for naturalization because he had been a lawful permanent resident for the last five years. *See* 8 U.S.C. § 1427(a). In the space on the application form asking Mr. Khawatmi to list his children, he listed none. *See* Resp.'s Ex. 529. However, in the portion of the application form containing questions about prior marriages, Mr. Khawatmi listed his marriage to Ms. Vega. *See id.* In the portion of the application form containing questions about Mr. Khawatmi's prior residences, he did not list the Hancock Avenue address where he and Ms. Vega allegedly lived with her mother. In connection with his application, Mr. Khawatmi submitted statements from his former wife and former mother-in-law. *See* Resp.'s Exs. 516-17. Although both statements discussed the dissolution of the marriage, neither statement mentioned Ms. Vega's infidelity, nor the fact that she had given birth to another man's baby during the waning years of the marriage. In fact, Mr. Khawatmi's mother-in-law plainly stated that "*the only problem* in their marriage was the fact that he worked too many hours and he and my daughter almost never saw each other." Resp.'s Ex. 517 (emphasis added).

Mr. Khawatmi signed his second naturalization application under oath. *See* Resp.'s Ex. 529.

USCIS Officer James Schiavone interviewed Mr. Khawatmi about his second naturalization application on August 2, 2005. Mr. Schiavone took notes from the interview in red pen on a copy of Mr. Khawatmi's application. *See id.*; Tr. [doc. # 54] 282:19-284-13. Mr. Schiavone placed a check mark next to the portion of Mr. Khawatmi's application on which Mr. Khawatmi indicated that he did not have children. *See* Resp.'s Ex. 529. Also according to Mr. Schiavone's notes, Mr. Khawatmi stated regarding the dissolution of his marriage: "She left because [I] was having financial issues. She moved to another state (Virginia). She met someone. She moved around." *Id.* When Mr. Schiavone asked Mr. Khawatmi whether he had ever withheld a material fact from a government official, Mr. Khawatimi also stated: "No." *Id.*

In a decision dated June 29, 2007, USCIS denied Mr. Khawatmi's second naturalization application. *See* Resp.'s Ex. 520. USCIS did not contest that Mr. Khawatmi met the age, *see* 8 U.S.C. § 1445(b), continuous residence, *see id.* § 1427(a), physical presence, *see id.* § 1427(c), English language knowledge, *see id.* § 1423(a)(1), and knowledge of United States history and government, *see id.* § 1423(a)(2), requirements for naturalization. But USCIS denied the application for two reasons. First, USCIS concluded that Mr. Khawatmi had not been lawfully admitted for permanent residence in the United States. Resp.'s Ex. 520; *see* 8 U.S.C. § 1429. That conclusion was essentially based on USCIS's factual determination that Mr. Khawatmi had never actually resided with Ms. Vega. *See* Resp.'s Ex. 520. Second, USCIS concluded that Mr. Khawatmi lacked the "good moral character" required for naturalization, 8 U.S.C. § 1427(a)(3), because he had provided false testimony regarding the dissolution of his marriage during his interview with Mr. Schiavone. *See* Resp.'s Ex. 520.

Mr. Khawatmi filed an administrative appeal from the denial of his second naturalization

application. In a decision dated September 16, 2008, USCIS affirmed its earlier decision to deny his application. *See* Resp.'s Ex. 521. The basis for that determination was that Mr. Khawatmi had failed to introduce any new information, evidence, or testimony which would warrant overturning the original decision to deny his application. *See id.* On October 24, 2008, Mr. Khawatmi timely filed a petition for *de novo* review of his second naturalization application by this Court pursuant to 8 U.S.C. § 1421(c). *See* Compl. [doc. # 1].

## III.

As the Court discussed at the outset, there are two different legal issues in this case. Those two issues relate to two different statutory requirements that all applicants for naturalization must fulfill in order to qualify for United States citizenship; the Government does not dispute that Mr. Khawatmi meets all of the other requirements for naturalization. The first requirement at issue here is that in order to qualify for citizenship, a person must "ha[ve] been lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1429. The second requirement at issue here is that in order to qualify for citizenship, a person must "ha[ve] been and still [be] a person of good moral character." *Id.* § 1427(a)(3). The Court sets forth the applicable law regarding both of those requirements below. Significantly, it is Mr. Khawatmi's burden to establish that he meets both requirements. *See id.* §§ 1429, 1427(e). "The Government has a strong and legitimate interest in ensuring that only qualified persons are granted citizenship," and doubts regarding his eligibility must be resolved in the Government's favor. *Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967); *see Oguntoye v. Gonzalez*, No. 2:05cv5530 (JG), 2007 WL 1394130, at *1 (E.D.N.Y. Apr. 23, 2007) ("Should the court have doubts about the applicant's eligibility . . . [they] should be resolved in favor of the government.").

## A.

The Government argues that Mr. Khawatmi is ineligible for naturalization because he was never lawfully admitted for permanent residence in the United States. *See id.* § 1429. Section 1429 provides:

> Except as otherwise provided in this subchapter, no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of this chapter. The burden of proof shall be upon such person to show that he entered the United States lawfully . . . .

*Id.* Section 1101(a)(2) of the same Title defines "lawfully admitted for permanent residence" as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." *Id.*

Mr. Khawatmi obtained lawful permanent resident status as a result of his marriage to Ms. Vega, a United States citizen. 8 U.S.C. § 1154(a) permits a citizen of the United States to file a petition with the Attorney General in order to obtain lawful permanent resident status for an alien spouse. *See id.*; *see also id.* § 1151(b) (providing that spouses of United States citizens are "immediate relatives" within the meaning of the federal immigration statutes, and as such are eligible for immediate-relative visas). Section 1154(b) provides that petitions under § 1154(a) "shall" be approved, so long as the Secretary of the Department of Homeland Security "determines that the facts stated in the petition are true and that the alien . . . is an immediate relative" of a United States citizen or lawful permanent resident. *Id.* § 1154(b). The statute places one key limitation on the granting of visas to spouses of citizens: "no [immediate relative] petition shall be approved . . . by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws." *Id.* § 1154(c).

The Second Circuit has never had occasion to construe the meaning of the phrase "for the purpose of evading the immigration laws" in § 1154(c). However, the Board of Immigration Appeals ("BIA"), which is charged with the administration of the federal immigration statutes, *see Vargas-Sarmiento v. U.S. Dept. of Justice*, 448 F.3d 159, 165 (2006), has long interpreted § 1154(c) as prohibiting the Attorney General from granting an immediate relative petition by reason of a marriage that was entered into for the "primary purpose" of circumventing the immigration laws. *Matter of Soriano*, 19 I. & N. Dec. 764, 765 (BIA 1988) ("A marriage that is entered into for the *primary purpose* of circumventing the immigration laws . . . [does not] enable[e] an alien spouse to obtain immigration benefits." (emphasis added)); *see, e.g.*, *In re Perez-Felix*, File No. A096 576 415, 2009 WL 5548128, at *1 (BIA Dec. 31, 2009). The BIA has also long held that the "central question" to be considered in determining the "primary purpose" of a marriage is "whether the bridge and groom intended to establish a life together at the time they were married," and that "[t]he conduct of the parties before and after marriage is relevant to their intent at the time of marriage." *Soriano*, 19 I. & N. Dec. at 765; *see, e.g. In re Rosario*, File No. A097 478 752, 2009 WL 5443915, at *1 (BIA Dec. 18, 2009). Finally, the BIA holds that evidence relevant to the "primary purpose" inquiry may "take many forms, including, but not limited to, proof that the beneficiary has been listed as the petitioner's spouse on insurance policies, property leases, income tax forms, or bank accounts, and testimony or other evidence regarding courtship, wedding ceremony, shared residence, and experiences." *Soriano*, 19 I. & N. Dec. at 766.

The Court adopts the BIA's framework for determining whether a marriage was entered into for the purpose of evading the immigration laws, including its "primary purpose" standard. At least three Courts of Appeal have following that general framework. *See Brown v.*

*Napolitano*, 391 Fed. App'x 346, 351-352 (5th Cir. 2010) (summary order); *Yong Hong Guan v. INS*, 998 F.2d 1017 (Table), 1993 WL 265107, at *2 (7th Cir. 1993) (summary order); *Bark v. INS*, 511 F.2d 1200, 1201 (9th Cir. 1975). Admittedly, only the Ninth Circuit has done so in a published opinion. *See Bark*, 511 F.2d at 1201. But more importantly, the Second Circuit has repeatedly indicated that when provisions in federal immigration statutes are ambiguous, the BIA's interpretations of those provisions are entitled to *Chevron* deference so long as they are reasonable. *See, e.g.*, *Mei Fun Wong v. Holder*, --- F.3d ----, No. 08-5328-ag, 2011 WL 293762, at *3 (2d Cir. Feb. 1, 2011) (citing *Chevron, U.S.A., Inc. v. Natural Recs. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984)). The Court has little difficulty concluding that the meaning of § 1154(c) is ambiguous, that the BIA's interpretation of § 1154(c) is reasonable, and that the BIA's interpretation of § 1154(c) is entitled to deference. *See Chevron*, 467 U.S. at 842-44.

**B.**

The Government argues that Mr. Khawatmi is ineligible for naturalization because he is not now, and has not been, a person of good moral character. *See* 8 U.S.C. § 1427(a). Section 1427(a) provides that "[n]o person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant . . . during all the periods referred to in this subsection has been and still is a person of good moral character . . . ." *Id.* Section 1101(f) of the same Title further provides that "[n]o person shall be regarded as, or found to be, a person of good moral character who . . . has given false testimony for the purpose of obtaining [immigration] benefits . . . ." *Id.* The relevant period for determining whether an applicant has been a person good moral character begins five years before his or her naturalization applicable was filed – in this case, beginning on October 14, 1999. *Id.* § 1427(a)(3). In determining whether an applicant was a person of good moral character throughout that period, however, the Court "may take into consideration as a

basis for such determination the applicant's conduct and acts at any time prior to" that period. *Id.* § 1427(e). It is the applicant's burden to show that he or she is and has been a person of good moral character throughout the statutory period. *See id.*[6]

According to the Government, this Court should find that Mr. Khawatmi is not now and has not been a person of good moral character because he has given false testimony for the purpose of obtaining immigration benefits. *See id.* § 1101(f). In *Kungys v. United States*, 485 U.S. 759 (1988), the Supreme Court held that § 1101(f) does not contain "a materiality requirement for false testimony." 485 U.S. at 779. The Supreme Court reasoned:

> On its face, § 1101(f)(6) does not distinguish between material and immaterial misrepresentations. Literally read, it denominates a person to be of bad moral character on account of having given false testimony if he has told even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits. We think it means precisely what it says.

*Id.* at 779-80. The Supreme Court explained that such a reading is consistent with the primary purpose of § 1101(f), which not to prevent false testimony from being introduced into the naturalization process, but rather to identify lack of good moral character: "The later appears to some degree whenever there is a subjective intent to deceive, no matter how immaterial the deception." *Kungys*, 485 U.S. at 780; *cf. United States v. Wells*, 519 U.S. 482, 485 (1997) (holding, for similar reasons, that materiality is not an element of the crime of knowingly making a false statement to a federally insured bank).[7]

---

[6] There is a dispute in this case about whether Mr. Khawatmi must establish his good moral character by a preponderance of the evidence or by clear and convincing evidence. Because the Court ultimately determines that Mr. Khawatmi has not show good moral character even under the less exacting preponderance of the evidence standard, the Court need not resolve that dispute.

[7] Mr. Khawatmi's counsel represents that the Fifth Circuit has held that false testimony must also be material to the application or inquiry in order to deny a benefit. *See Gonzalez-Maldonado v. Gonzalez*, 487 F.3d 975, 977 (5th Cir. 2007). But his counsel is simply wrong about what the Fifth Circuit held in that case. In that case, the Fifth Circuit merely observed that it is more

Although § 1101(f) does not contain a materiality requirement, there are some significant limits on its reach. The Supreme Court emphasized in *Kungys* that "[a] literal reading of the statute does not produce draconian results, for several reasons." 485 U.S. at 780. First, by using the term "testimony," Congress limited the provision's application to oral statements made under oath. *Id.* Second, the provision only applies "to those misrepresentations made the subjective intent of obtaining immigration benefits." *Id.* Third, the provision does not apply to "concealments." *Id.* at 781; *see also Medina v. Gonzales*, 404 F.3d 628, 634 (2d. Cir. 2005) ("The Supreme Court has held that the term 'testimony,' as employed in 8 U.S.C. § 1101(f)(6), is 'limited to oral statements made under oath' and 'does not include 'other types of misrepresentations or concealments, such as falsified documents or statements not made under oath.'") (citation omitted)).

## IV.

### A.

The Court first considers whether Mr. Khawatmi has established that he was lawfully admitted to the United States for permanent residence. *See* 8 U.S.C. § 1429. There is no question that Mr. Khawatmi did, in fact, obtain lawful permanent resident status as a result of the petition Ms. Vega filed on his behalf, nor is there any dispute that the Government approved that petition. The Government's only argument is that, in light of facts that the Government was not aware of before Mr. Khawatmi filed his two naturalization applications, his petition for lawful permanent

---

difficult to show that a misrepresentation was made with the intent to secure immigration benefits when it was immaterial. *See id.* at 978. The Supreme Court made the same observation in *Kungys*. *See* 485 U.S. at 780-81 ("Obviously, it will be relatively rare that the Government will be able to prove that a misrepresentation that does not have the natural tendency to influence the decision regarding immigration or naturalization benefits was nonetheless made with the subjective intent of obtaining those benefits.").

resident status should never have been approved in the first place.

There are certainly many aspects of Mr. Khawatmi's marriage to Ms. Vega that cause the Court some concern. First, Mr. Khawatmi proposed to Ms. Vega after knowing her for less than six months, and then immediately applied for lawful permanent resident status after they were married. Second, there are some unusual discrepancies between the stories that the two tell of their courtship; in particular, Ms. Vega remembers that they regularly went to the movies together – specifically, Denzel Washington movies – but Ms. Khawatmi remembers going to the movies only once. Third, Mr. Dimmad, who was Mr. Khawatmi's closest friend at the time of the courtship, does not recall Mr. Khawatmi or Ms. Vega ever having expressed affection for one another. Fourth, none of their family members attended their wedding, nor can they identify with specificity anyone else who attended, and they have no photographs of the wedding. Fifth, Ms. Vega could not recall the name of the business where Mr. Khawatmi worked during most of their marriage, nor could she accurately recall the location of the business. Sixth, during the time when they were allegedly still living together and still getting along perfectly well, Ms. Vega began sending important mail to her brother's address for reasons that she was not fully able to explain to the Court. Seventh, during the period when their marriage allegedly declined, Ms. Vega's lifestyle became radically different from Mr. Khawatmi's – she drank frequently, went to nightclubs, was arrested for drug charges, and even had a child out of wedlock – and was able to successfully hide significant events, including her arrest and her one-night stand.

That said, the central question the Court must ask in inquiring into the validity of Mr. Khawatmi's and Ms. Vega's marriage is whether they intended at the outset to share their lives with one another. *See Soriano*, 19 I. & N. Dec. at 765. There is absolutely no evidence in the

record that Mr. Khawatmi paid Ms. Vega to pretend to be his wife. Although the Court need not – and ultimately does not – credit Mr. Khawatmi's and Ms. Vega's story about how long they actually resided together and how long they continued to act as an ordinary married couple, the evidence supports their claim that they did initially reside together after they were first married. The record also contains testimony from both Mr. Khawatmi and Ms. Vega that they were in love, that they wanted to lived together, and that they wanted to raise a family together. In light of that testimony, the Court has no doubt that the primary purpose of the marriage was *not* to circumvent federal immigration law. *See id*. The Court therefore concludes Mr. Khawatmi has carried his burden of establishing that he was indeed lawfully admitted for permanent residence in the United States. *See* 8 U.S.C. § 1429.

The Court again emphasizes that while there are numerous troubling aspects about Mr. Khawatmi's and Ms. Vega's story, those troubling aspects largely relate to the state of their marriage several years into their marriage, and are consistent with a marriage entered into for valid purposes. The Court credits the testimony of Ms. Vega that she was very young when she decided to accept Mr. Khawatmi's marriage proposal, that she made a huge mistake by agreeing to marry him in the first place, and that her initial mistake caused their marriage to crumble. The fact that they had a small marriage and a modest honeymoon, and that they did not reschedule their wedding plans when Ms. Vega's mother had to take an emergency trip to Puerto Rico, can be fully explained by their economic circumstances at the time of the marriage. Their differing memories, their failure to find photographs of the wedding, and the fact that they are no longer friendly with the people who attended the wedding is explained by the fact that years have passed, that memories fade, and that they have both moved on with their lives.

## B.

The Court next considers whether Mr. Khawatmi has shown that he is now, and has been since October 14, 1999, a person of good moral character. *See id.* § 1427(a). More specifically, the Court considers whether Mr. Khawatmi gave "false testimony for the purpose of obtaining [immigration] benefits," *id.* § 1101(f), during the statutory period. If Mr. Khawatmi did give such false testimony, the Court has no choice but to find that he has not been a person of good moral character, and that he is therefore ineligible for naturalization at this time.

Mr. Khawatmi gave testimony under oath to Officer Schiavone in connection with his naturalization application on August 2, 2005, and Officer Schiavone took notes regarding that testimony on Mr. Khawatmi's application form. *See* Resp.'s Ex. 529; Tr. [doc. # 54] 282:19-284-13. Three of the answers Mr. Khawatmi gave to Officer Schiavone trouble the Court. The first answer that troubles that Court is that Mr. Khawatmi confirmed to Officer Schiavone that he did not have any children. *See id.* The second answer that troubles the Court is that Mr. Khawatmi told Officer Schiavone that Ms. Vega left him because he was having financial issues. *See id.* The third answer that troubles the Court is that Mr. Khawatmi confirmed to Officer Schiavone that he had never given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent removal. *See id.* In the Court's view, all three of those statements constituted false testimony given for the purpose of obtaining immigration benefits. *See* 8 U.S.C. § 1101(f).

The Court begins with the first statement, that Mr. Khawatmi did not have any children. Federal immigration law defines "child" to include "an unmarried person under twenty-one years of age who is . . . a stepchild, whether or not born out of wedlock, provided the child had not

reached the age of eighteen years at the time the marriage creating the status of stepchild occurred." *Id.* § 1101(b)(1)(B). It is true that nothing on the form Mr. Khawatmi filled out defined the term "child" – although the form did direct Mr. Khawatmi that he could consult further instructions "[f]or more information on which sons and daughters you should include and how to complete this section."[8] Resp.'s Ex. 529. Mr. Khawatmi testified at the hearing that was confused about whether he needed to mention Ms. Vega's child since it was technically not his own, and that he was embarrassed about disclosing his former wife's infidelity. It is also true that there is no evidence that Officer Schiavone explained to Mr. Khawatmi that he needed to account for stepchildren as well as has own biological children. Indeed, when Officer Schiavone testified at the hearing, even he was not quite sure whether under the circumstances, Ms. Vega's child should have been listed as Mr. Khawatmi's stepchild. *See* Tr. [doc. # 54] at 285:6-13.

Nevertheless, under all of the circumstances, the Court does not credit Mr. Khawatmi's excuses about why he stated that he had no children without making any attempt to explain the circumstances of the birth of Ms. Vega's child, and without asking any questions about the need to list stepchildren. According to both Mr. Khawatmi and Ms. Vega, the pair lived together with Ms. Vega's child for some time during their marriage, even though Mr. Khawatmi was not the child's biological father. Indeed, Mr. Khawatmi even testified during a deposition in this case that he considered the child to be part of his family. *See id.* at 124:19-25. Because Mr. Khawatmi has himself asserted that he considered the child part of his own family, the Court therefore cannot conclude other than that Mr. Khawatmi's oral statement to Officer Schiavone that he did

---

[8] Neither party sought to introduce the text of those further instructions into evidence, and there is no evidence that Mr. Khawatmi was ever provided with a copy of those further instructions.

not have any children – which the Court emphasizes was made under oath – was a false statement. Indeed, Mr. Khawatmi's failure to mention his wife's infidelity and pregnancy as at least *one* of multiple reasons for the collapse of their marriage is almost shocking.

The Court also concludes that Mr. Khawatmi made that false statement under oath with the subjective intent to obtain immigration benefits. It is true that if Mr. Khawatmi had disclosed the existence of the child to USCIS, that fact alone would not necessarily have barred him from gaining his citizenship. But this case appears to be one of those relatively cases the Supreme Court contemplated in *Kungys* in which a technically immaterial misrepresentation "was nonetheless made with the subjective intent of obtaining" immigration benefits. 485 U.S. at 780-81. It is reasonable under the circumstances of this case to infer that Mr. Khawatmi told Officer Schiavone for a specific purpose. Officer Schiavone testified that if Mr. Khawatmi had he discovered that his Mr. Khawatmi's wife had a child out of wedlock during their marriage, USCIS would have pressed for more details about the legitimacy of Mr. Khawatmi's marriage to Ms. Vega. *See* Tr. [doc. # 54] at 294:14-21. The Court credits that testimony, and concludes in part based on that testimony that Mr. Khawatmi more than likely made his statement that he did not have any children in order to prevent such an inquiry from taking place. *Cf. Edem-Effiong v. Acosta,* No. Civ. A. H-04-2025, 2006 WL 626406, at \*5-6 (S.D. Tex. Mar. 13, 2006) (concluding that an alien withheld information about a child that the alien fathered out of wedlock during his marriage to a United States citizen in order to reduce the likelihood that USCIS would question the legitimacy of his marriage to the United States citizen).

The Court now turns to the second statement, regarding the reasons for Mr. Khawatmi's separation from Ms. Vega. The Court has absolutely no doubt that the explanation Mr.

Khawatmi gave to Officer Schiavone – again, under oath – about the circumstances under which his marriage ended was a false statement. Indeed, it is almost shocking that Mr. Khawatmi would not mention his wife's infidelity and the fact that she gave birth to a child out wedlock – a child that Mr. Khawatmi thereafter accepted into his own home and treated as a member of his family – in stating the reasons why his marriage to Ms. Vega ended.

The Court also concludes that Mr. Khawatmi made the false statement to Officer Schiavone about the reasons why his marriage ended with the subjective intent to obtain immigration benefits. The Court believes Mr. Khawatmi lied about the end of his marriage for the same reasons that he lied about whether he had children: had he told the truth about his relationship with Ms. Vega, immigration officials would have conducted further investigations into the legitimacy of the marriage, and those investigations may have made approval of his application less likely. Even if Mr. Khawatmi's statement was not technically material, the Court has no doubts about Mr. Khawatmi's reasons for making the false statement.

Finally, the Court turns to the third statement, that Mr. Khawatmi never gave any false or misleading information to any Government official while applying for any immigration benefit. Even if the Court did not believe that Mr. Khawatami's answers on his immigration form and his confirmation of those answer to Officer Schiavone constituted outright *false* statements, the Court has no doubt that those answers and statements were at the very least *misleading*. Indeed, at least one other district court undertaking the same task that the Court undertakes here denied a petition for naturalization on the ground that the alien misleadingly omitted information about the birth of a child out of wedlock during his marriage from his naturalization application, and that his statement to a Government official that he had never given misleading information while

seeking immigration benefits was thus itself a false statement. *See id*. In this case, the statements Mr. Khawatmi made to Officer Schiavone were not even the only misleading information Ms. Khawatmi gave to USCIS in connection with his naturalization application. Mr. Khawatmi also submitted affidavits from Ms. Vega and from his former mother-in-law that describe the reasons for the collapse of the marriage, and which also entirely omit the fact that Ms. Vega was unfaithful and had a child out of wedlock during the marriage. *See* Resp.'s Exs. 516, 517. Again the Court has no doubt that the primary purpose of Mr. Khawatmi's false statement that he never gave misleading information to any Government official in order to obtain immigration benefits was to preclude further inquiries into the legitimacy of his marriage to Ms. Vega.

The Court believes there was only one reason why Mr. Khawatmi gave false statements and submitted misleading information to the Government in connection with his application for citizenship. Mr. Khawatmi was willfully trying to secure his citizenship, and did not want to risk upsetting that process by telling the truth about his former wife. If he had done so, it may well have led to a long, involved investigation into his marriage, which in the end could have led to the denial of his application. Mr. Khawatmi has the burden of showing his good moral character, and any doubts about his character must be resolved in favor of the Government. *See Berenyi*, 385 U.S. at 637. The Court finds that at this time, Mr. Khawatmi cannot demonstrate the good moral character that is necessary to obtain citizenship. *See, e.g.*, *Rico v. INS*, 262 F. Supp. 2d 6, 10 (E.D.N.Y. 2003) (finding that the petitioner's "lack of candor" regarding his criminal background precluded a finding of good moral character); *Aboud v. INS*, 876 F. Supp. 938, 941 (S.D. Ohio 1994) (finding that the petitioner's "fail[ure] to tell . . . his true employment history"

precluded a finding of good moral character).[9]

## V.

In sum, the Court concludes based on its *de novo* review that Mr. Khawatmi has established that he was lawfully admitted to the United States for permanent residence. However, the Court also concludes that he has not established that he is now, and has been since October 14, 2009, a person of good moral character. The Court reaches the later conclusion because it finds that during the course of his application for citizenship, Mr. Khawatmi gave false testimony to USCIS for the purpose of obtaining immigration benefits. Mr. Khawatmi's petition, *see* Compl. [doc. # 1], is therefore DENIED. **The Clerk of the Court is directed to enter judgment for Respondents and to close this file.**

IT IS SO ORDERED.

/s/      Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: February 9, 2011.**

---

[9] Throughout this case, Mr. Khawatmi has relied on Judge Christopher F. Droney's decision in *Poka v. INS*, No. 3:01cv1378 (CFD), 2002 WL 31121382 (D. Conn. Sept. 19, 2002). The Court is not persuaded by Mr. Khawatmi's analogy to that case. The petitioner in *Poka* argued that he failed to disclose a prior arrest and conviction because of his poor grasp of the English language. *See id.* at *2. Judge Droney concluded that while the petitioner had given false testimony to USCIS, he had done so not for the purpose of obtaining immigration benefits, but rather because he did not understand the meaning of the English words "arrested" and "conviction." *See id.* at *4. Indeed, the Court determined that the petitioner was ineligible for naturalization because of his poor grasp of the English language and denied his petition on that ground. *See id.* Based on the Court's observations at the hearing, the Court believes that Mr. Khawatmi appears to be an intelligent man who also has a strong grasp of English. The Court need not – and does not – credit his assertion that his misrepresentations resulted from mere misunderstandings.